IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LORI STEWART,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>MOUNTAINLAND TECHNICAL COLLEGE,<br><br>　　　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00086-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

Plaintiff Lori Stewart ("Stewart" or "Plaintiff") brings two causes of action against her former employer, Defendant Mountainland Technical College ("MTECH," "the College," or "Defendant"): (1) discrimination in violation of the Rehabilitation Act and (2) retaliation in violation of the Rehabilitation Act. 29 U.S.C. § 701 *et seq*. Before the court is MTECH's motion for summary judgment on both claims. ECF No. 40. For the reasons set forth herein, the court DENIES this motion.

## FACTUAL BACKGROUND

MTECH is an accredited, public technical college that belongs to the Utah System of Technical Colleges and the Utah System of Higher Education. ECF No. 20 at 8-9. MTECH has several campuses scattered throughout northern Utah. ECF No. 40-2 at 89:9-11. The College hired Stewart in 2003 and promoted her to Director of Apprenticeship Programs in 2008. *Id*. at 152:2-6, 153:3-5.

## I.      STEWART'S ILLNESS AND REQUESTED ACCOMODATIONS

Stewart suffers from blepharospasm, a condition that causes the muscles in her eyelids to uncontrollably spasm and close. ECF No. 2 at 8. "The condition also causes pain, fatigue, and hypersensitivity to certain types of light." *Id*. Specifically, harsh light with a high Kelvin rating aggravates Stewart's condition, while softer lighting with a low Kelvin rating causes less pain. ECF No. 40-2 at 15:13-19. Dr. Todd Engen ("Dr. Engen") initially diagnosed Stewart with this illness in 2017 after several misdiagnoses by other doctors. *Id*. at 19:913, 86:4-6. After the onset of her condition, Stewart had only three methods for managing her symptoms. First, on Dr. Engen's suggestion, Stewart received Botox injections around her eyes every three months. ECF No. 40-2 at 22:2-13. Second, she wore rose colored glasses to reduce her exposure to harsh light. *Id*. at 22:14-25. Third, as detailed below, Stewart attempted to avoid contact with irritating indoor lighting as much as possible.

Around the time of her diagnosis, MTECH undertook a substantial remodel of the office building in which Stewart worked ("North Campus"). ECF No. 40-3 at 9:19-24. During this remodel, Stewart used a classroom in a nearby MTECH academic building ("South Campus") as her workplace. ECF No. 40-2 at 28:1-9. Soft fluorescent lighting that did not significantly aggravate Stewart's condition lit her temporary office at South Campus. *Id*. at 39:12-19. The remodel of North Campus was finished sometime around the end of June and the beginning of July in 2018. The project's completion prompted Stewart to move into a new office at North Campus. *Id*. at 25:18-21. Stewart's new office did not have windows facing the outdoors, but it did have a window looking into a hallway. *Id*. at 28:10-29:7, 38:9-19. Plaintiff estimates that, after the move, she spent between 30% and 40% of her working time in this office and the rest traveling to oversee the apprenticeship program at other MTECH campuses around the state. *Id*. at 88:16-25, 89:1-11.

Once stationed at North Campus, Stewart experienced an increase in blepharospasm symptoms due to the harsh lighting installed during the building's renovation. In response to her increasingly uncomfortable condition, Stewart sent an accommodation request to MTECH's Director of Human Resources, Justin Browning ("Browning") in an email on July 26, 2018. *Id*. at 10-13; ECF No. 40-9. In this email, Stewart explained that she had already begun working with "facilities" to fix the lighting issues in the new building. ECF No. 40-9. So far, they had installed a dimmer switch in her office, but this solution had not resolved her symptoms. *Id*. Stewart noted that a lamp she brought from home had softened some of the harsh lighting in her office, but that she would "appreciate having a blind installed in the window by [her] door to help block out the lights in the hallway." *Id*. MTECH eventually complied with Stewart's request for blinds, but testimony from Browning and Director of Facilities Blake Hendry ("Hendry") indicates that they may not have been installed until December, 2018, around four months after Plaintiff's email. ECF No. 4-5 at 107:1-4; ECF No. 40-3 at 45:2-13.

In her initial accommodation request, Stewart also noted that the "lighting over at the south campus worked well with my eyes, so maybe a different type of lighting, along with incandescent lamps, might work." ECF No. 40-2 at 30:18-25. Responding to this suggestion, Hendry told Stewart that she could temporarily move her office back to South Campus. *Id*. at 42:17-45:15. Stewart declined this suggestion because South Campus contained no offices, only classrooms that were in use nearly every day. *Id*. at 43:5-8, 44:20-24. At South Campus, Stewart would have had to pack up all of her belongings at the end of each work session due to security concerns, which Stewart believed was an untenable solution to the conflict between the requirements of her job and health. *Id*. at 47:14-20.

In August 2018, soon after Stewart's initial request for accommodations, Hendry and Jeff Searle ("Searle")[1] met with Plaintiff to discuss potential accommodations for her condition. *Id*. at 49:19-50:17. According to Stewart, Hendry and Searle spoke about lighting solutions before the meeting and used their discussion with her to explain that "they would try to do whatever they could, but [needed] to get things approved by Gordon [Reynolds]." *Id*. at 50:12-17. Gordon Reynolds ("Reynolds") was the Director of Program Trades and Stewart's direct supervisor. ECF No. 40-8 at 8:1; ECF No. 40-2 at 159:3-11. During this meeting, Stewart did not ask for any specific form of accommodation, yet, shortly thereafter, MTECH purchased colored gel filters to cover the LED lighting in the hallway outside her office. The filters were installed in September 2018 with the intent of reducing the strain on Stewart's eyes. ECF No. 40-2 at 59:8-12, 65:9-16. Rather than help, they further contributed to Stewart's suffering. *Id*. Initially, Stewart did not inform MTECH that the gel filters were causing her a great deal of pain, but after a co-worker complained about the filters to Hendry in Stewart's presence, she admitted that they were doing more harm than good. *Id*. at 66:8-14, 68:18-23. In October 2018, soon after this conversation, Hendry removed the filters. *Id*.

Near the end of August 2018, Stewart approached MTECH Vice President Holly Peterson ("Peterson") about the possibility of turning off the lights in the hallway outside her office until MTECH could provide other accommodations. ECF No. 40-10 at 12. By this point, Stewart had realized that the lighting in this hallway was making her "very, very sick." ECF No. 40-2 at 76:23-25. The hallway in question was approximately 30 feet long and shaped like an "L," with four overhead lights in the main section of the corridor just outside of Stewart's office and two in a short section leading to a restroom. ECF No. 40-3 at 38:5-13. Peterson approved Stewart's idea of

---

[1] Serle was an instructor under Stewart's supervision whose mother suffered from blepharospasm.

shutting off the lights in the hallway, so long as there was a sign posted so that students knew Stewart was in her office. *Id*. Stewart also discussed a similar solution with Hendry. At a meeting in September 2018, she asked him whether she could have an apprenticeship instructor disconnect one of the ceiling lights directly outside her office. ECF No 40-3 at 42:7-12. Hendry denied this request, citing safety concerns related to a loss of emergency lighting. *Id*. Regardless of Hendry's reluctance to allow Stewart to disconnect a hallway light, MTECH eventually allowed her to turn off the lights in the hallway outside her office during evening working hours, as per her conversation with Peterson. ECF No. 49-13.

On August 27, 2018, Stewart's physician, Dr. Engen, signed a letter stating that Stewart required accommodations for her eye conditions. ECF No. 40-2 at 88:12-15; ECF No. 49-5. The letter explained that "[i]n her work environment, it appears [Stewart] is being quite aggravated with the overhead lighting." ECF No. 49-5. As a solution to this problem, Dr. Engen recommended that MTECH, (1) reduce Stewart's exposure to LED and fluorescent lighting, and (2) install a dimmable lighting system.[2] ECF No. 40-2 at 90:8-19. On September 20, 2018, Stewart met with Browning to discuss this letter.[3] *Id*. at 98:24-25, 99:1-3, 16-21. In the meeting, she specifically explained that the LED lights in the hallway outside her office were causing her discomfort, as stated in her doctor's letter. *Id*. Soon thereafter, Stewart provided Browning with an article discussing "the Dark Side of Lighting." *Id*. at 101:18-102:1.

On November 7, 2018, MTECH backtracked on its commitment to allow the lights outside Stewart's office to remain off during evening working hours. Reynolds met with Stewart in her office to communicate that MTECH was changing its stance for several reasons. First, Reynolds

---

[2] By this point, MTECH had already installed a dimmer switch in Stewart's office. ECF No. 40-9.

[3] Stewart also met with Browning to discuss the letter on September 11, 2018. *Id*. 84:4-21.

indicated that students were missing meetings with employees on Stewart's hallway because the lack of lighting made them believe staff was not present. ECF No. 40-8 at 27:20-28:3, 39:14-18. MTECH was also concerned that keeping the lights off during working hours might violate OSHA and building code requirements, as well as create a safety and liability risk. ECF No. 40-3 at 67:25-68:15. Stewart alleges that after Reynolds explained that she was no longer allowed to turn off lights in the hallway, he mockingly said "toodles" as he left her office. ECF No. 40-2 at 259:21-260:13. From this point on, the hallway lights remained on during working hours.

On November 12, 2018, Stewart and Browning met again to discuss hallway lighting solutions. ECF No. 40-10 at 14. At this meeting, Stewart alleges that after reiterating that the lights in the hallway had to remain on during working hours, Browning stated that he was resistant to installing softer lighting in the hallway because he worried that doing so would force MTECH to change lighting in the entire building. *Id*. According to Stewart, Browning instead suggested that she simply sit in her office with her back facing the hallway window. *Id*. Stewart responded that changing her office furniture configuration was not a viable solution because it did nothing to resolve pain experienced when she was required to leave her office. *Id*. Stewart also reiterated that she only required a lighting change in the immediate vicinity of her office. *Id*. The next day, Stewart met with Kirt Michaelis, MTECH's CFO, and Hendry. During this meeting, Hendry allegedly stated that Stewart's doctor believed the current hallway lights were "just fine." ECF No. 40-10 at 24.

Soon after this meeting, on November 14, 2018, MTECH ordered two fluorescent fixtures to replace the LED fixtures in Plaintiff's office. ECF No. 40-2 at 73:10-23; ECF No. 49-8 at 8. These fixtures were designed to function with low-Kelvin fluorescent bulbs. ECF No. 40-2 at

94:19-95:4. The fixtures were not installed for another month because they were back ordered. ECF No. 40-3 38:14-17, 43:12-25, 95:10-96:12.

On November 26, 2018, Stewart emailed Michaelis, Reynolds, and Browning to complain about MTECH's lack of accommodations for her condition. ECF No. 49-13. Specifically, she noted that while MTECH had initially allowed her to shut off the lights in the hallway outside her office to accommodate her condition, they had been "turned back on to their fully intensity," which "made it nearly impossible for [her] to work." *Id*. Stewart claimed that she had "asked multiple individuals for the lights in [her] work area to be changed, left off, reduced in intensity, undone, or a combination thereof. However, [her] requests [had] been denied from numerous individuals." *Id*. Two days later, on November 28, 2019, Stewart again complained to Browning about the lack of modification to the lighting in the hallway. ECF No. 40-10 at 15. Responding to this complaint, Browning told Stewart he would "get back" to her about changing the lighting. *Id*. Around this time, Browning was engaged in internal communications about Stewart's accommodations. In an email sent to MTECH employees on November 30, 2018, he stated that he felt like keeping the "lights out in the hall way [sic] is unfair to the other employees in the hall. And letting [Stewart] work from home does not allow her to meet her responsibilities." ECF No. 50-7. Browning ultimately suggested that MTECH needed to conduct additional research into finding a reasonable long-term solution to Stewart's complaints. *Id*.

On December 7, 2018, Stewart again spoke with Peterson about her accommodation requests. During this meeting, Stewart explained that her only remaining request was that the hallway lights outside her office be dimmed, replaced, or turned off. *Id*. at 114:25-115:13, 116:1-13. In response, Peterson allegedly suggested that Stewart "take disability" in order deal with her

medical issues.[4] ECF No. 40-10 at 15. Peterson also allegedly stated that she was worried switching out the hallway lights in the entire building would cost too much money. *Id*. Stewart responded that her request was reasonable because she only wished to have the lights on *her* hallway changed. *Id*.

After meeting with Peterson, Stewart emailed Browning on December 9, 2018 to reiterate that she did not need new lighting in her office, and that fixing the hallway lighting was her top priority. ECF No. 40-11. Stewart suggested that instead of installing low-Kelvin lights in her office, MTECH should use the lights it had purchased on November 14 in the hallway. *Id*. Five days later, on December 14, 2018, MTECH installed the two new fixtures in the hallway as requested. ECF No. 40-3 38:14-17, 43:12-25, 95:10-96:12. That same day, MTECH ordered two additional fixtures to replace the remaining two LED fixtures in the main section of the hallway. ECF No. 49-8 at 5. But the two new fixtures were not delivered until early February because they were once again back ordered. ECF No. 40-3 at 38:23-39:14, 40:6-9. MTECH installed the additional fixtures on February 4, 2019. *Id*.

On January 7, 2019, after the installation of the first set of new hallway lights, Reynolds emailed Stewart and asked if the lights were "helping with your eyes." ECF No. 40-12. Stewart replied, "The lights in the hallway . . . so far so good." *Id*. Stewart has no recollection of informing MTECH that the new light fixtures did not adequately fulfill her requests for accommodations. ECF No. 40-2 at 139:2-6.

Still, on January 23, 2019, Stewart's legal counsel sent a letter to MTECH President Clay Christensen ("Christensen"), Browning, and Reynolds stating that (1) Stewart was in the process of filing a charge of discrimination with the Utah Antidiscrimination and Labor Division

---

[4] MTECH maintains that Peterson made this suggestion in good faith.

("UALD"), (2) MTECH had failed to grant Stewart's requests for reasonable accommodations, and (3) MTECH had subjected Stewart to unlawful discrimination under the Americans with Disabilities Act ("ADA"). ECF No. 50-9. On February 28, 2019, Stewart's attorney filed this charge with UALD and emailed a notarized copy to MTECH. ECF No. 50-12. Later that same day, MTECH terminated Stewart. ECF No. 49-15 at 150:19-21.

## II.     STEWART'S WORK AND QUALIFICATIONS

In her role as Director of Apprenticeship Programs, Stewart was required to perform several essential job functions. As of 2018, these duties were listed in a job description that Stewart had helped prepare. ECF No. 40-21. They included, but were not limited to, (1) setting program hours and instructor schedules, (2) providing first line support to students, staff, and instructors, (3) providing leadership in curriculum development and planning, and in the implementation of college policies and procedures, including attendance, payroll, enrollment, and tuition policies, (4) assisting MTECH's Vice President for Instruction and the Director of Trades in carrying out accreditation activities and assignments for the Council of Occupational Education ("COE"), and (5) assisting in interviewing and hiring staff and instructors. *See id*. Stewart's job description also contained several "competencies" that she was expected to possess. ECF No. 40-2 at 210:25, 211:1-4; ECF No. 40-21. They included the ability to work alone without supervision or on a team, extensive knowledge of state and federal apprenticeship programs and licensing rules, and the ability to report student progress to local state agencies. *Id*. In practice, Stewart's job required her to ensure the smooth functioning of MTECH's apprenticeship program, which held classes taught by trade instructors from 6:00 P.M. to 9:00 P.M. on weeknights. In performing her essential job functions, Stewart often relied on her assistant, Alexandra Bueno ("Bueno"). ECF No. 40-2 at 28:16-20.

In 2014, Reynolds became Stewart's direct supervisor through his position as Director of Trades Programs. From that year on, Reynolds annually submitted reviews detailing Stewart's job performance. At first, these reviews were relatively complimentary. In 2016, for instance, Reynolds' review stated that Stewart did not need to improve any aspect of her performance and that "life is good right now." ECF No. 40-17. However, in early 2018, Reynolds' reviews began to focus more heavily on Stewart's faults. The first 2018 review (acknowledged by Stewart on June 8) stated that:

> Communication between Apprenticeship and Counseling and Student Services needs to improve greatly. Regular coordination needs to occur on a monthly basis for the coming school year. Apprenticeship needs to let Counselors work with students who are struggling with attendance and progress. Emails and phone calls from students need to be answered within 48 hours[.] Regular meetings with Trades Director need to occur monthly for the coming school year[.]

ECF No. 40-19. Still, this review admitted that these problems were by no means unsolvable. Indeed, it noted that "[t]he 'growing pains' associated with the [program's] growth have brought some issues to the surface that will be easily addressed and will help Lori to manage further growth." *Id*.

In late 2018, the comments in Stewart's performance review deteriorated precipitously. ECF No. 40-20. In a review covering the relevant dates from May 2018 to December 2018, Reynolds stated that Stewart needed to improve her "timeliness with critical dates and assignments." *Id*. This reflected the alleged fact that Stewart's "narrative and exhibits for the COE Reaffirmation visit were due in July and weren't completed until October 20th" and that "[t]he help of other MTECH staff was necessary to get the information entered and edited before the visit on October 22nd." *Id*. Stewart disputed this negative characterization of her performance. In her statement of acknowledgment on December 31, 2018, she commented "Disagree - I do not agree

this evaluation is correct. I think this is not favorable and is in retaliation for my accomodation [sic] request." *Id.*

On February 27, 2019, Reynolds claims to have decided to terminate Stewart. ECF No. 40-8 at 127:16-22. Reynolds did not require approval from his supervisors to end Stewart's employment. *Id.* at 18-25. The next day, in a letter dated February 28, 2019, MTECH informed Stewart of her termination. ECF No. 40-23. This communication listed several explanations for MTECH's decision, many of which focused on the alleged fact that, due to Stewart's actions, "[s]tudents are not receiving all of the instruction they are entitled to in the classes in which they have enrolled" and "[e]mployers are not receiving fully trained employees that they have entrusted to MTECH for apprenticeship training." *Id.* These complaints were a specific reference to the allegation that Stewart had allegedly allowed instructors to regularly dismiss their classes mere minutes after they began in violation of MTECH policy. The letter also stated that Stewart had placed the continued viability of the apprenticeship program at risk and that, due to her actions, the college faced "serious criticism for conducting sub-standard programs which could jeopardize program accreditation or licensing of students." *Id.*

After terminating Stewart, Reynolds temporarily took on all of the responsibilities assigned to the Director of Apprenticeship Programs for between eight and ten months. ECF No. 40-8 at 151:9-20. During this period, Stewart alleges that instructors in the apprenticeship program continued to release their classes early. *Id.* at 151:17-24. There is no indication that MTECH disciplined Reynolds for his failure to address this continuing problem. After completing a search for Stewart's permanent replacement, MTECH hired Cliff Carron-Campbell ("Carron-Campbell") as the new Director of Apprenticeship Programs and simultaneously engaged in changes to the program's structure, providing its new Director with additional support. ECF No. 40-5 at 141:18-

25. As part of a reorganization of the program, MTECH hired a new program coordinator to assist Carron-Campbell[5] and additional IT/Northstar support to ensure that instructors could teach their classes and take student roll in the evenings without issue. ECF No. 40-8 at 156:20-157:5; ECF No. 40-6 at 59:8-23, 64:9-12. This new hiring spree corresponded with significant growth of the apprenticeship program. ECF No. 57 at 53. There is, evidence indicating that even after additional hiring, the program still struggled to prevent early dismissals. ECF No. 50-14.

On February 11, 2020, nearly a year after her termination, Stewart filed a complaint with this court alleging that MTECH had violated both the ADA and Rehabilitation Act by discriminating on the basis of disability. ECF No. 2. Stewart also claimed that MTECH had violated the ADA and Rehabilitation Act by terminating her employment in retaliation for her requests for accommodations and her UALD charge. *Id*. On March 3, 2021, the court dismissed each of Plaintiff's ADA claims because MTECH, a government entity, was entitled to immunity from this cause of action under the Eleventh Amendment. ECF No. 26. The court allowed Stewart's Rehabilitation Act claims to move forward. *Id*. MTECH filed this motion on May 4, 2022, requesting that the court grant summary judgment on each of Stewart's remaining claims. ECF No. 40.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this

---

[5] MTECH alleges that this program coordinator replaced Stewart's assistant, Bueno, who departed her position shortly after Stewart's termination.

burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). However, this does not mean that nonmovants may "defeat summary judgment by relying on 'ignorance of the facts, on speculation, or on suspicion.'" *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)). "Rather, '[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.'" *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (alteration in original) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)) (emphasis added).

## ANALYSIS

The court begins by addressing the relevant evidentiary objections raised by each party before turning to Stewart's substantive claims under the Rehabilitation Act.

## I.    EVIDENTIARY OBJECTIONS

To prevail on a motion for summary judgment, parties are required to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial . . . ." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing Fed. R. Civ. P. 56(e)); *see also* Fed. R. Civ. P. 56(c)(2). While "evidence need not be submitted in a form that would be admissible at trial . . . the content or substance of the evidence must be admissible." *Argo v. Blue Cross & Blue Shield, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quotations marks omitted).

Stewart and MTECH both advance evidentiary objections to the statements of facts ("SOF") presented in the briefing on this motion. The court first rules on Stewart's objections and then proceeds to MTECH's objections. It does not consider evidentiary disputes that are immaterial to the outcome of this motion.

### A. STEWART'S OBJECTIONS

#### 1. MTECH's SOF No. 54

In SOF No. 54, MTECH claims that it initially honored Plaintiff's request to turn off all of the LED lights in the hallway outside Stewart's office but reversed course "after consulting risk management and considering issues of safety and liability, as well as OSHA and building code requirements." SOF No. 54. Stewart objects to this assertion on the ground that there is no foundation to support the fact that turning off hallway lights violated OSHA or building code requirements. *Id*. The court overrules this objection. MTECH does not attempt to show that turning off the lights actually violated OSHA or building codes. Rather, it simply offers evidence that the potential for OSHA and building code violations was considered when MTECH denied Plaintiff's accommodation request. Deposition evidence stating that this was MTECH's rationale is sufficient foundation to support Defendant's limited claim. *See, e.g.*, ECF No. 40-3 at 68:2-10.

#### 2. MTECH's SOF No. 70

In SOF No. 70, MTECH claims that its employees received several complaints that Stewart was constantly unavailable to students with questions and problems related to the apprenticeship program. As support for this assertion, MTECH offers deposition testimony from Peterson and Reynolds explaining that they had witnessed students complain about Stewart's unavailability. ECF No. 40-7 at 50:15-22; ECF No. 40-8 at 29:22-25, 30:1-25, 31:1-9, 53:22-25, 54:1-14, 59:3-10, 182:15-25, 183:1-6, 187:9-25, 188:1-4. Stewart objects to this testimony as inadmissible hearsay under Fed. R. Evid. 802. The court overrules this objection. While the anonymous student

complaints were out of court statements, they are not solely presented to prove the truth of the matter asserted, i.e., that Stewart was unavailable and, thus, poorly performing an essential function of her position. Instead, MTECH can offer this testimony to show that it was under pressure from unhappy students to make changes to improve the apprenticeship program.

### 3. MTECH's SOF Nos. 92-94

In SOF Nos. 92-94, MTECH claims that "during 2017 and 2018, . . . MTECH received numerous complaints and criticisms from students, business and industry partners, and program instructors that the program was being operated in a substandard way." SOF No. 92 (citing ECF No. 40-7 at 50:15-22; ECF No. 40-8 at 29:22-25, 30:1-25, 31:1-9, 53:22-25, 54:1-14, 59:3-10, 182:15-25, 183:1-6, 187:9-25, 188:1-4). These complaints included criticism from Commissioner Jared Haines of the Utah System of Technical Colleges, whose son was enrolled in the apprenticeship program at MTECH. SOF No. 94. Stewart objects to these allegations as inadmissible hearsay and as lacking foundation. The court overrules her objections. While this set of negative comments by students, parents, partners, and instructors is entirely comprised of out of court non-sworn statements, these complaints are not solely offered to prove the truth of the matter asserted, i.e., that under Stewart, the apprenticeship program was poorly run. Instead, they are offered to show that MTECH received criticism about the quality of its apprenticeship program and that it was under significant pressure to make improvements. The voluminous deposition testimony provided on this issue establishes sufficient foundation to support MTECH's claim.

### B. MTECH'S OBJECTION

### 1. Stewart's SOF No. 28

In her SOF No. 28, Stewart asserts that, after her termination, apprenticeship instructors continued to dismiss their classes early. To support this statement, Stewart cites several emails, letters, and declarations from MTECH teachers and students with personal knowledge of

instructors' dismissal practices after Stewart's termination. ECF Nos. 49-19, 49-20, 50-4, 50-13, 50-14. MTECH objects to each piece of evidence for a combination of reasons, including vagueness, relevancy, and lack of foundation. MTECH's primary complaint is that these statements do not specify a time period to which they apply other than the period after Stewart's termination. According to MTECH, because the letters contain no timing information, it is unclear whether classes were dismissed early only when Reynolds temporarily directed the apprenticeship program or whether this practice continued once Carrin-Campbell took over. MTECH argues that this timing discrepancy matters because Reynolds was not a similarly situated employee to Stewart and only an employer's treatment of similarly situated employees is relevant when analyzing if an employee was terminated for pretextual reasons. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000). Ultimately, the court overrules MTECH's objection. Though it would have been helpful if each document specified the time period to which it applied, this evidence's lack of specificity does not mean that the court must exclude it. At the very least, this evidence introduces a material dispute over timing that the parties can explore in more depth during a trial. And at least one declaration did specify the time period to which it applied. ECF No. 50-14 (claiming "[l]ess support from both Gordon Reynolds and Cliff Carrin-Campbell.").

MTECH also argues that the court ought to exclude evidence that students left class early, because what is at issue in this case is not whether students left early, but rather, whether their teachers "let them out" early. Once more, at least one declaration submitted by Plaintiff did make such a distinction. This declaration specifies that "[s]tudents were still allowed to leave class early" by their teachers and that "very few visits were made to the campus to ensure that teachers were also staying and teaching their class until 9:00 p.m." *Id*. This evidence is admissible and is

sufficient to give rise to a dispute over whether teachers dismissed their classes early after Stewart's termination.

## II.      REHABILITATION ACT CLAIMS

Under Section 504 of the Rehabilitation Act, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any" federal program. 29 U.S.C. § 794(a).[6] This language creates several potential claims for plaintiffs with disabilities. *Detterline v. Salazar*, 320 F. App'x 853, 856 (10th Cir. 2009). Here, Stewart claims that MTECH violated Section 504 of the Rehabilitation Act by (i) denying her reasonable accommodation requests, (ii) failing to engage in the interactive process for requesting accommodations, (iii) terminating her employment because of her disability and/or because she requested accommodations for her disability, and (iv) terminating her employment in retaliation for engaging in protected activity. The court examines each claim in turn. It groups its discussion of Plaintiff's "interactive process" and "reasonable accommodation" claims because "[t]he interactive process is typically an essential component of the process by which a reasonable accommodation can be determined." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) (en banc). It also groups discussion of Plaintiff's "discrimination" and "retaliation" claims, as both pertain to her wrongful termination.

---

[6] The language of the Rehabilitation Act is similar to the anti-discrimination language in the ADA, so claims under both acts generally share the same body of case law. *See Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 n. 9 (4th Cir.1995) ("Because the language of [Title II of the ADA and the Rehabilitation Act] is substantially the same, we apply the same analysis to both."); *Patton v. TIC United Corp.*, 77 F.3d 1235, 1245 (10th Cir.1996) ("To the extent feasible, we look to decisions construing the Rehabilitation Act to assist us in interpreting analogous provisions of the ADA.").

## A. FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS AND ENGAGE IN THE INTERACTIVE PROCESS

The ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."[7] *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 674 (10th Cir. 2021) (citing 42 U.S.C. § 12112(b)(5)(A)). Plaintiff must make an initial showing that she meets four requirements in order to establish a prima facie failure-to-accommodate claim: (1) she was disabled, (2) she was otherwise qualified, (3) she requested a plausibly reasonable accommodation, and (4) MTECH refused to accommodate her disability. *See Lincoln v. BNSF Ry.*, 900 F.3d 1166, 1204 (10th Cir. 2018) (emphasis added). Ultimately, the task of "[e]stablishing a prima facie claim is not onerous." *Aubrey v. Koppes,* 975 F.3d 995, 1005 (10th Cir. 2020). This court examines elements three and four together.

If Stewart establishes a prima facie claim of discrimination, the burden shifts to MTECH "to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Lincoln*, 900 F.3d at 1204 (internal quotation marks omitted). If MTECH can meet either of these two burdens, "summary judgment will be appropriate . . . unless the employee then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitates any challenged elements of . . . her prima facie case sufficiently to establish at least a genuine dispute of material fact . . . ." *Punt v. Kelly*

---

[7] "In 1992, Congress amended the Rehabilitation Act to provide that, in employment discrimination cases alleging violations of the Rehabilitation Act, '[t]he standards used to determine whether this section [of the Rehabilitation Act] has been violated . . . shall be the standards applied under title I of the Americans with Disabilities Act.' 29 U.S.C. § 794(d)." *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004).

*Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017) (quoting *Midland Brake*, 180 F.3d at 1179). The court examines if Defendant can establish a defense to Plaintiff's prima facie case, and whether Plaintiff can overcome this defense, when it analyzes MTECH's alleged denial of Stewart's requested accommodations.

This burden shifting framework does not "probe the subjective intent of the employer," but rather provides a "useful structure by which the district court, when considering a motion for summary judgment, can determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered." *Midland Brake*, 180 F.3d at 1179 n.12.

### 1. Stewart's Prima Facie Claim

#### a. Stewart had a Disability

Under relevant provisions of the ADA, the term disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004) (citing 42 U.S.C. § 12102(2)). Stewart was diagnosed with blepharospasm in 2017. This condition causes the muscles in Stewart's eyelids to uncontrollably spasm. ECF No. 2 at 8. It also "causes pain, fatigue, and hypersensitivity to certain types of light." *Id*. Stewart's blepharospasm clearly impaired her ability to perform "major life activities," which includes seeing, reading, thinking, and working, without accommodations. *See* 42 U.S.C. § 12102(2)(A). MTECH does not dispute that Stewart's condition qualifies as a disability for the purposes of this motion.

#### b. Stewart was Otherwise Qualified for her Position

The ADA prohibits a "covered entity" from "discriminat[ing] against a *qualified individual* on the basis of disability." 42 U.S.C. § 12112(a) (emphasis added). "The term 'qualified

individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Aubrey*, 975 F.3d at 1006 (citing 42 U.S.C. § 12111(8). In addition to proving that she can perform essential functions, Stewart must also establish that she possesses "the requisite skill, experience, education and other job-related requirements of the employment position." *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001).

As an initial matter, Stewart can show that she had the requisite skill, experience, and education to hold her position as Director of Apprenticeship Programs. Stewart worked for MTECH for over 16 years and earned a promotion during this period. Additionally, up until 2017, the year she was diagnosed with her condition, Stewart received generally positive reviews for her work. ECF Nos. 40-15–40-18. While MTECH notes that Plaintiff possesses only a high school diploma and is employed in a position that generally requires a college degree, it seems to have continually overlooked her lack of formal education due to the wealth of experience she brought to the position. Indeed, as of 2018, the formal job description for Director of Apprenticeship Programs was specifically written to only require a high school diploma and 10 years of management experience as an accommodation for Plaintiff. ECF No. 40-21.

Stewart also provides sufficient evidence that she could perform the essential functions of her position during the period during which she was denied accommodations. First, the fact that MTECH employed Stewart for months while the parties negotiated accommodations indicates that, at least during this timeframe, MTECH considered Stewart capable of performing these functions. Second, as discussed in the section of this opinion pertaining to MTECH's potentially pretextual reasons for termination, Plaintiff has produced evidence undermining MTECH's claim that it fired Stewart because she failed to perform several essential functions of her job. At this

juncture, the court finds that there is evidence to show that Stewart was otherwise qualified for her position.

    *c.  Stewart Requested Reasonable Accommodations that MTECH Did Not Grant*

Under the ADA's implementing regulations, once a qualified individual informs her employer of a disability, the employer must engage the employee in an interactive process to determine if it can make reasonable accommodations for its employee's condition. *See* 29 C.F.R. § 1630.2(o)(3); *see also Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). This process requires employers and employees to work together to identify the employee's precise limitations and discuss accommodations that might enable the employee to continue working. *Id.* An employer must make a reasonable effort to explore the accommodation possibilities with the employee. *Id.* "The obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee." *Midland Brake*, 180 F.3d at 1172. The process is meant to ensure that a reasonable accommodation is identified, if one is available. *See id*. While there are "no rules of universal application" to determine the necessary shape or scope of the interactive process, a party who obstructs or delays the process does not act in good faith, nor does a party who "fails to communicate, by way of initiation or response." *Provstgaard v. IHC Health Services, Inc.*, No. 2:14–cv–00117, 2016 WL 6108545, *9 (D. Utah Oct. 19, 2016); *Midland Brake*, 180 F.3d at 1172. Employers who cause delays can be held liable for failure to provide reasonable accommodations. *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1262-63 (10th Cir. 2001). Despite its importance, the interactive process is only a means to an end to help employers and employees reach an agreement. Thus, once an employment discrimination action has commenced, in order to recover, a plaintiff must first show that a plausibly reasonable accommodation was possible. *Midland Brake*, 180 F.3d at 1174; *see also McBride v. BIC Consumer Prods.*, 583 F.3d 92, 101 (2d Cir.2009) ("[A]n

employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA.").

The Tenth Circuit uses a burden shifting framework to decide whether an accommodation is reasonable. *See Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267-68 (10th Cir. 2015) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995)). "First, the employee 'need only show that an accommodation seems reasonable on its face, i.e., ordinarily or in the run of cases.'" *Id*. at 1267 (quoting *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)) (further internal quotation marks omitted). "A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue." *Id*. (citing 29 C.F.R. § 1630.2(o)(1)(ii)). "Second, if the employee presents a facially reasonable accommodation, the burden of production then shifts to the employer to present evidence of its inability to accommodate. The employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" *Id*. (quoting *Barnett*, 535 U.S. at 402) (citation, further internal quotation marks, alteration omitted). These circumstances include "the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility." 42 U.S.C. 12111(10)(B)(ii). "Third, if the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Id*. at 1268 (internal quotation marks omitted). Determining whether a requested accommodation is reasonable is a mixed question of law and fact that must take into consideration an employee's disability and employment position. *Osborne*, 798 F.3d at 1267; *Punt*, 862 F.3d at 1050 (internal quotation marks

omitted). With this law in mind, the court examines the reasonableness of Plaintiff's accommodation requests and MTECH's response to each request.

*First, Stewart alleges that MTECH failed to accommodate her reasonable request to periodically turn off the lights in the hallway outside her office and disconnect one of these lights permanently.* Applying the burden shifting analysis, the court initially finds that Plaintiff's requests were reasonable on their face because they would enable Stewart to walk in the hallway outside her office without significant pain. Even walking to the bathroom in the original fixtures' harsh light made it significantly more difficult for Stewart to work. *See* ECF No. 40-2 at 260:22-25 ("I had severe cramping. I was in a tremendous amount of pain. And I just remember trying to force [my eyes] open so I could do my job because I loved my job."). Indeed, MTECH does not dispute that changing the hallway lighting would have improved Stewart's ability to perform the essential functions of her job.

After establishing that Plaintiff made two plausibly reasonable requests, the court turns to whether MTECH can show that Stewart's requests posed an undue hardship. First, MTECH argues that Plaintiff's requests to disable a single light fixture or periodically turn off hallway lights posed an undue burden because turning off lights would create safety concerns for its employees and potentially violate local building codes and OSHA requirements. While MTECH offers evidence that its facilities and risk management team *believed* that turning out a light could pose these concerns, Stewart rehabilitates this portion of her prima facie case by pointing out that MTECH has not established that Plaintiff's requested accommodation violated any law or posed any actual risk.[8] Indeed, MTECH has not produced statutory or regulatory language applicable to Stewart's

---

[8] See Stewart's objection to MTECH's SOF No. 54.

request. Nor has it provided evidence of injury or complaint about hallway safety when the lights were turned off. The court, thus, finds that there is a material dispute of fact as to this issue.

MTECH also argues that Plaintiff's request to turn off lights periodically after workday hours posed an undue hardship because, when hallway lighting was turned off, students believed that no staff was present and, as a result, missed several meetings. ECF No. 40-8 at 39:14-18. According to MTECH, the inability of students to find their meetings had a significant impact on the "operation of the facility," qualifying Stewart's request as an undue hardship. 42 U.S.C. 12111(10)(B)(ii). Other than contesting the admissibility of *some* of the evidence indicating that students missed meetings, Stewart does not introduce a dispute of material fact as to this issue.[9]

Finally, MTECH argues that its decision to refuse to allow Stewart to disable a single hallway light and periodically turn out all the lights in her hallway was reasonable because Plaintiff simultaneously requested that MTECH replace the hallway lights with softer lighting. This is beside the point. Plaintiff was told that she would not be allowed to disable a single hallway fixture in September and was ordered not to turn off her hallway lights in early November. New hallway lighting was not installed until December 14, 2018. This leaves a period of over a month when Plaintiff was provided no lighting accommodations in the hallway and experienced significant pain.

Ultimately, MTECH has shown that its decision to stop Plaintiff from turning out every light on the hallway was reasonable, but it does not carry its burden to show that disabling a single

---

[9] Stewart objects to several pieces of evidence showing that students complained about the lack of hallway lighting when Stewart turned off the lights. The court does not cite this evidence or make a ruling on whether it is inadmissible hearsay. Instead, it simply cites firsthand testimony from Reynolds that he "watched students come in and would sometimes direct them, 'she's in her office,'" in order to alert students that the fact that lights were out did not mean other employees were not available. ECF No. 40-8 at 39:14-18.

hallway light was unreasonable. Therefore, Stewart may only maintain her claim as it relates to her request to disable a single light.[10]

*Second, Stewart alleges that MTECH failed to accommodate her reasonable request to replace the lights in the hallway outside her office with softer lighting.* MTECH does not contest that this request was reasonable. Indeed, it notes that it eventually installed the requested lighting and Stewart confirmed that this change met her expectations. ECF No. 40-12. Rather, the question here is whether MTECH constructively refused to accommodate Stewart's request by dragging its feet for months during the interactive process.

The Tenth Circuit applies four factors in determining whether a delay in providing an accommodation violates federal law: (1) the length of the delay, (2) the reasons for the delay, (3) whether the employer has offered any alternative accommodations while evaluating a particular request, and (4) whether the employer has acted in good faith. *Selenke*, 248 F.3d at 1262-63. The court examines each factor in turn.

As an initial matter, the court finds that there is evidence suggesting that the delay in finding a reasonable accommodation began on July 26, 2018, when Stewart allegedly told Hendry "that the hallway lights bothered her eyes" and requested blinds, or in the alternative, a different type of lighting," ECF No. 40-10 at 15. In conversations that followed, Stewart alleges that she continued to clearly state that the lighting in the hallway outside her office aggravated her eyes and that she required accommodations. *Id.* at 12. MTECH did not install new lighting outside Stewart's office until December 14, 2018.[11] ECF No. 40-3 38:14-17, 43:12-25, 95:10-96:12. At

---

[10] If Defendant can provide statutory or regulatory language that required it to maintain the lighting status quo outside Stewart's office, Plaintiff's case will significantly weaken.

[11] Stewart argues that her request was never fully granted because lights in the section of the hall leading to the restroom were never installed and a second pair of lights on the main hallway were not replaced. The court disagrees. The only available evidence suggests that Stewart was content

first glance, the delay between request and provision of the accommodation was nearly five months.

But while the time between Stewart's initial request for accommodations and installation of new lighting was substantial, there were potentially legitimate reasons for this delay. And MTECH also offered Stewart substitute accommodations during this period. First, MTECH notes that Plaintiff's initial email and communications regarding her requested accommodations were unclear. Specifically, it points out that the July 26, 2018 email's main request for accommodations was for the installation of a blind in Stewart's office to block light from hallway. ECF No. 40-9. But Stewart responds that MTECH failed to install a blind in her office until December, meaning that even her specific request went unaddressed for months.  ECF No. 4-5 at 107:1-4; ECF No. 40-3 at 45:2-13.

MTECH also argues that soon after the July 26, 2018 email, Hendry and Searle met with Plaintiff to discuss accommodations. Plaintiff did not make specific requests for accommodations at this meeting, so MTECH unilaterally decided to install gel filters in the hallway in an attempt to meet Stewart's needs. ECF No. 40-2 at 59:12. From the moment they were installed, Stewart did not believe that the gel filters helped address her condition. Yet, Stewart failed to alert MTECH to her concerns until late October 2018. *Id*. at 66:8-14, 69:25-70:1. MTECH could not have known that this attempt at accommodation had failed until Stewart informed them of this fact, and MTECH removed the gel filters soon after. *Id*.

In October 2018, MTECH also allowed Stewart to turn off the lights in the hallway outside her office. This reduced Plaintiff's suffering significantly, but on November 7, 2018, Reynolds

---

with MTECH's accommodations by early January. On January 9, 2019, she sent an email to Reynolds stating, "The lights in the hallway . . . so far so good." ECF No. 40-12.

revoked Stewart's permission to keep these lights off and provided no new accommodation to mitigate the resulting pain. ECF No. 40-10 at 14. From this point on, Stewart regularly demanded that MTECH replace the lights in the hallway. *Id*. On November 14, 2018, MTECH ordered new lighting fixtures, but these were meant for Stewart's office, not the hallway. ECF No. 40-2 at 73:2-23, 76:4-9, 94:19-25, 95:1-4. On December 9, 2018, Stewart suggested that MTECH install the lights for her office in the hallway. To be clear, Stewart had requested new lights in the hallway for a month but proposed a new method for meeting her request on December 9th. ECF No. 40-2 at 77:10-23, 78:3-11, 79:1-25, 80:1-4. On December 14, 2018, five days after receiving Stewart's suggestion, MTECH installed the two fixtures in the hallway. In short, there was a month-long delay between when Stewart began pressing hard for a change in hallway lighting in early November and when the new lighting was installed in mid-December. During this period, Stewart was provided no significant protection from the harm of the hallway lights despite months of prior requests for accommodations.

The final factor the court must examine in assessing whether Plaintiff can establish a case of delay in the interactive process is MTECH's state of mind. A jury could find that MTECH's failure to provide Stewart with a reasonable accommodation to mitigate her suffering from the hallway light during the period from November to December, even though it had been alerted to Stewart's needs for months, is evidence of bad faith. After examining evidence regarding the delay, the court narrowly finds that there are disputes of material fact as to whether MTECH properly engaged in the interactive process as to Stewart's request to change the lighting outside her office. Accordingly, the court denies Defendant's motion for summary judgment on Plaintiff's reasonable accommodations claim.

### A.  Wrongful Termination

Stewart also claims that MTECH violated the Rehabilitation Act by terminating her employment because of her disability and in retaliation for her accommodation requests. Discrimination and retaliation claims under the Rehabilitation Act are analyzed using the *McDonnell Douglas* burden-shifting framework when plaintiffs cannot introduce direct evidence of a defendant's intent, as is the case here. 411 U.S. 792 (1973); *see Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016); *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1109 (10th Cir. 1999). Under this framework, a plaintiff must first establish a prima facie case of discrimination or retaliation. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). Next, "the employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action. If the employer can do so, the burden shifts back to the plaintiff to prove pretext, which requires a showing that the proffered nondiscriminatory reason is unworthy of belief." *EEOC v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012) (citations and quotation marks omitted).

#### 1.  Stewart's Prima Facie Case

##### a.  Retaliation

To establish a prima facie case of retaliation under the Rehabilitation Act, Stewart must show that (1) she "engaged in a protected activity," (2) she was "subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity," and (3) there was "a causal connection between the protected activity and the adverse employment action." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999).

First, Stewart engaged in protected activity under the ADA. Good faith requests for accommodations are undoubtedly protected activity. *Jones v. U.P.S. Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007). Stewart submitted multiple good faith accommodation requests from July 2018

until her final day of employment with MTECH on February 28, 2019. Each of these requests is protected activity. Notably, Stewart engaged in protected activity when her counsel sent letters on January 23, 2019, and February 28, 2019, first asking for accommodations and informing MTECH that she was planning to file UALD charges, and then stating that she had filed UALD charges. Causing her lawyer to send these letters was also protected activity.

Second, MTECH's decision to terminate Stewart's employment on February 28, 2019 was clearly an adverse employment action. *See, e.g.*, *Anderson*, 181 F.3d at 1178.

Third, there is sufficient evidence to show that there was a causal connection between the protected activity and the adverse employment action. A causal connection between protected activity and the adverse employment action is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, "such as protected conduct closely followed by adverse action." *Garrett v. Hewlett Packard*, 305 F. 3d 1210, 1221 (10th Cir. 2002) "[A]n ADA retaliation plaintiff may rely solely on temporal proximity to show causation during the prima facie stage of the *McDonnell Douglas* framework where [her] protected activity is closely followed by an adverse employment action." *Foster*, 830 F.3d at 1191.

In the Tenth Circuit, a one-and-a-half-month gap between protected activity and adverse action may, by itself, establish causation. *Id.*; *see also Argo*, 452 F.3d at 1202 (holding that six weeks gives rise to a rebuttable inference of a causal connection). Proximity should not be heavily policed where a pattern of retaliation began soon after a plaintiff engages in a protected activity and later culminates in termination. *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).

Here, Stewart can easily establish a causal connection between her protected activity and MTECH's adverse employment action. On February 28, 2019, Stewart submitted a copy of her

UALD charge of discrimination to MTECH. Later that same day, MTECH notified her that it was terminating her employment. Thus, Plaintiff fulfills each of the elements required to establish a prima facie case of retaliation.

    *b.  Discrimination*

To establish a prima facie case of discrimination under the Rehabilitation Act, Stewart must show (1) that she was disabled within the meaning of the ADA, (2) that she was qualified for the job she held, and (3) that she was discriminated against because of her disability. *See Osborne*, 798 F.3d at 1266. Plaintiff's burden at this *McDonnell Douglas* stage is not an onerous one. *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).

First, as previously established, it is uncontested that Stewart had a disability as defined by the ADA.

Second, Stewart was otherwise qualified for her position because she could "perform the essential functions of [her] employment position" and maintained "the requisite skill, experience, education and other job-related requirements of [her] employment position." *Aubrey* 975 F.3d at 1006; *Tate*, 268 F.3d at 993. The court refers back to its previous analysis of Stewart's successful attempt to establish a prima facie case of failure to accommodate. It also examines whether Plaintiff performed the essential requirements of her position in more depth when it determines if MTECH's reasons for termination were pretextual.

Third, the circumstances surrounding Stewart's termination "give rise to an inference that the [action] was based on [Stewart's] disability." *Smothers*, 740 F.3d at 544. To satisfy the third element of a prima facie case of discrimination, courts "require[] the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision." *Lincoln*, 900 F.3d at 1193 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (emphasis in original)). There are several ways a plaintiff can present affirmative evidence that disability was

a determining factor in a termination decision. Courts infer discrimination when an employee is terminated with suspicious timing, when similarly situated employees are treated more favorably, and when decisionmakers make suspicious comments. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). Additionally, an employee can show discriminatory intent by offering evidence that their employer's proffered reason for termination was pretextual. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). "In assessing the inferences that may be drawn from the circumstances surrounding a termination of employment, the court must be alert to the fact that '[e]mployers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law.'" *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (10th Cir. 1994) (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir. 1989).

Here, the court finds sufficient evidence to support the third element of Plaintiff's prima facie claim. First, the timing of Reynolds' criticism of Stewart suspiciously lines up with Stewart's diagnosis with blepharospasm. The Tenth Circuit has long recognized that suspicious timing of termination is sufficient ground to establish a prima facie case of discrimination. *Chambers*, 43 F.3d at 37; *see also Plotke*, 405 F.3d at 1101. Stewart worked for a decade and a half with seemingly few complaints pertaining to her work. Then, after her condition developed in 2017 and she began requesting accommodations, complaints suddenly materialized in a significant way. Stewart's performance reviews offer a particularly stark example of this trend. Stewart's reviews were mostly positive through 2017, and even early 2018. ECF Nos. 40-15–40-19. Then, in December 2018, Stewart received her most critical review by far. ECF No. 40-20. So critical, in fact, that Stewart refused to acknowledge its accuracy and instead disputed its findings. *Id*. This

negative review was lodged around five months after Stewart first began asking for accommodations. Just three months later, she was terminated.

Additionally, Stewart points out Reynolds began holding her accountable for nearly all of the failings of the apprenticeship program only *after* her accommodations request. She alleges that Reynolds' new expectations were unfair, unreasonable, and indicative of the fact that she was terminated for pretextual reasons. *Reeves*, 530 U.S. at 147 (indicating that a showing of pretext can be used to build a prima facie case of discrimination). One revealing instance of stepped-up criticism after Stewart disclosed her disability was Reynolds' insistence that she had not prevented students who had not registered or paid tuition from attending classes. Reynolds had never complained to Stewart about this issue prior to her request for accommodations. And Stewart maintains that this issue was a responsibility of student services, as she could not even access tuition and registration information. ECF No. 40-2 at 253:18-21. Stewart argues that this criticism was particularly unreasonable because it required her to be in "every single class, every single night." ECF No. 49 at 67. The issue of unregistered and nonpaying students is but one example of Reynolds' claim that the reasons given for her termination were pretextual. Pretext is examined in more detail in the next two sections of this decision and serves to further establish Plaintiff's prima facie case.

Stewart can also establish a prima facie case of discrimination because "actions [and] remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" may give rise to an inference of discriminatory motive. *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). Reynolds' alleged interactions with Stewart suggest that he held some animus towards Plaintiff related to her condition. In particular, on November 7, 2018, Reynolds visited Stewart's office to inform her that MTECH was rescinding its permission to allow Plaintiff

to turn off the hallway lights. Stewart states that after Reynolds delivered this news, he mockingly remarked "toodles" as he left her office. ECF No. 40-2 at 259:21-260:13. As discussed in the reasonable accommodations section of this opinion, there is also substantial evidence that multiple employees in decision-making roles at MTECH did not take necessary steps to address Stewart's accommodation needs. If Stewart's allegation that MTECH was collectively dragging its feet in meeting her needs is true, this could indicate that MTECH harbored animus towards her claim of disability that may have colored its decision to end her employment. According to one of her colleagues, Stewart believed that the fact that her accommodations were never provided was an indication that soon "she was going to lose her job." ECF No. 50-3. Ultimately, the facts above are sufficient to support a prima facie case of discrimination.[12]

### 2.   MTECH's Legitimate Reason for Termination

Once a plaintiff produces sufficient evidence to support a prima facie claim, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for terminating the plaintiff. *McDonnell*, 411 U.S. at 802. Here, MTECH's reasons are contained in its termination letter to Stewart. ECF No. 40-23. This letter states that Stewart was terminated because of serious misconduct that had gone uncorrected. According to MTECH, because of Stewart's actions "[s]tudents are not receiving all the instruction they are entitled to in the classes in which they have enrolled. Employers are not receiving fully trained employees that they have entrusted to MTECH for apprenticeship training." *Id*. To support these accusations, MTECH lists several examples of Stewart's failings, including:

1.   Lack of supervision and verification leading to instructor timecard falsification;

---

[12] The court acknowledges that each argument advanced above is individually weak. But Plaintiff meets her burden of stating a prima facie claim because the burden for establishing such a claim is low and when each weak argument is considered along with the others, Plaintiff narrowly meets this relaxed standard. *See Horizon/CMS Healthcare Corp.*, 220 F.3d at 1191.

2. Classes ending early or not even beginning due to lack of supervision;
3. Class rolls not being entered on NorthStar, with 1600 unsubmitted rolls;
4. Allowing students to attend class when they have not registered, paid, or enrolled;
5. Failing to hire instructors in time to teach the first class of the semester; and
6. Ignoring directives from Reynolds to be present in classes to verify that they are taught.

*Id*. Additionally, MTECH notes that Stewart had failed to "operate the Apprenticeship Program in the same manner that MTECH runs all its other programs." *Id*. According to MTECH, this failure placed the College in the crosshairs of "serious criticism for conducting sub-standard programs which could jeopardize [its] accreditation or licensing of students." *Id*.

Taken as true, MTECH's allegations are more than sufficient to support the contention that Stewart was not performing the essential functions of her job. Thus, the court finds that MTECH meets its burden of articulating legitimate nondiscriminatory reasons for Stewart's termination.

### 3. MTECH's Reasons for Termination were Pretextual

If a defendant-employer articulates a legitimate reason for a plaintiff's termination, the burden shifts back to the plaintiff to demonstrate that the employer's stated reason for termination was a pretext for discrimination or retaliation. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). A plaintiff may show pretext by offering evidence that the defendant's proffered reason for termination was not a primary factor in the employer's decision. This is often accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence. *Aubrey*, 975 F.3d at 1015 (citing *Lincoln*, 900 F.3d at 1193). Evidence that tends to show that the employer's proffered non-discriminatory reason for termination was a post-hoc fabrication is also sufficient to indicate pretext. *Plotke*, 405 F.3d at 1102-03. Additionally, the Tenth Circuit has clarified that it is not necessary for plaintiffs to definitively show that each and every one of an employer's reasons for an adverse employment

action was wrong. Rather, if a plaintiff can show that the "pretextual character of one explanation is so fishy and suspicious that a jury could find that the employer (or its decisionmaker) lacks all credibility," a court may deny summary judgment. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005).

Stewart attempts to show that MTECH's reasons for termination were pretextual by offering evidence that she met the essential requirements of her position as Director of Apprenticeship Programs even as MTECH claimed otherwise. In its termination letter, MTECH explained that it chose to fire Plaintiff because she failed to meet the following requirements of her job: (1) properly set program hours and instructor schedules, (2) provide first line support to students, staff, and instructors, (3) provide leadership in curriculum development, and planning, and in the implementation of college policies and procedures, including attendance, payroll, enrollment, and tuition policies, (4) assist MTECH's Vice President for Instruction and the Director of Trades in carrying out accreditation activities and assignments for the Council of Occupational Education, and (5) assist in interviewing, hiring performance appraisals and discipline of staff and instructors. *See* ECF No. 40-21. Stewart contests that several of these duties, and sub-duties contained therein, were essential functions of her position. She also contests that she failed to adequately perform those functions that were essential to her job. The court examines each duty in turn to determine whether a reasonable juror could decide that MTECH's reasons for termination were pretextual.[13]

---

[13] The court engages in this analysis with the understanding that many of Stewart's arguments supporting the fact that her firing was pretextual overlap with its analysis of whether she was otherwise qualified for her position. *See* ECF No. 49 at 59.

First, Stewart argues that her firing was pretextual because setting program hours and instructor schedules was not an essential function of her job. Even if these tasks were hers, Stewart claims that she was held to impossible standards in fulfilling this requirement.

As an initial matter, Stewart states that setting program hours and instruction schedules could not have been an essential function because program hours were set "according to state rules" ECF No. 40-2 at 199:21-23. The court finds this argument lacking because this function was clearly enumerated in a list of "essential functions" in the 2018 job description for Director of Apprenticeship Programs. ECF No. 40-21.

One of Stewart's responsibilities derived from this function was ensuring that classes in the apprenticeship program were held from 6:00 P.M. to 9:00 P.M. each weeknight. ECF No. 200:23-201:10. On review of the evidence presented to the court, it is clear that Stewart did not successfully prevent *every* apprenticeship instructor from ending their classes early. ECF No. 40-2 at 243:15-18. Indeed, both Peterson and Reynolds personally verified that classes were sometimes dismissed minutes after they began.[14] ECF No. 40-7 at 58:11-20; ECF No. 40-8 at 107:21-109:13, 120:20-24, 142:13-22. Reynolds specifically flagged early dismissal of classes as one of the primary reasons for Plaintiff's termination. ECF No. 40-21.

Although Stewart failed to fully meet the requirements of this essential function, she submits evidence indicating that it was impossible for anyone to meet MTECH's standards. Stewart's position is best summed up by her testimony that "I can't be everywhere, again, and do everything, so I tried to keep the best eye on them I could. I -- to my knowledge, they weren't let

---

[14] MTECH offers a deposition statement from Christensen that he had knowledge of attempts to verify that apprenticeship classes were not being held from 6:00 P.M. to 9:00 P.M. Stewart objects that this statement is inadmissible hearsay. The court need not rule on this objection because there is admissible evidence from Peterson and Reynolds' statements as to this issue.

out after a few minutes." *Id.* at 243:21-244:1. The court agrees with Stewart's theory for the purpose of this motion for summary judgment. In the relevant period before she was terminated, Stewart oversaw 47 instructors, several hundred students, and classes taught on multiple separate campuses. It was physically impossible for her to verify that all of her instructors taught their class on any given night. Stewart claims that she took reasonable steps to ensure compliance from instructors. For instance, she held a teacher meeting each month where she discussed "attendance" and the fact "that classes were to be held from 6-9 p.m." ECF Nos. 49-16, 49-17. While Stewart was responsible for doing all she could to guarantee that classes were held as scheduled, she was reliant on instructors to teach their full class and truthfully fill out their timecards. Reynolds seemed to recognize that instructor behavior was mostly out of Stewart's control when he confirmed that, through terminating Stewart, he was holding her "accountable for the conduct of the teachers." ECF No. 40-8 at 125:23-126:1. Moreover, once Stewart was fired, MTECH's instructors did not stop dismissing their classes early. Statements from students and instructors indicate that Stewart's termination and Reynolds' installation as temporary Director of Apprenticeship Programs did not solve the problem. ECF Nos. 49-19, 49-20, 50-4, 50-13, 50-14. Collectively, this evidence could lead a jury to conclude that MTECH's stated expectations were unreasonable, providing some ground to find that its reasons for termination were pretextual.

Second, Stewart argues that her firing was pretextual because she adequately provided first line support to students, staff, and instructors despite MTECH's assertion that she did not. MTECH claims that, in 2018, it received several complaints from students that Plaintiff was consistently unavailable. Both Peterson and Reynolds assert that unnamed students stated that Stewart would not answer their emails or voicemails. Stewart argues that this criticism was false and, thus, pretext

for her termination.[15] Specifically, Stewart cites testimony from Searle, who stated that Stewart was "always available for the students and teachers," ECF No. 49-19, testimony from Wesley Anderson, an electrical instructor, who stated that Stewart was always "available to help with any problems or issues the students or instructor might have," ECF No. 49-10, and testimony from Branson Carter, a student, who confirmed that Stewart "was an excellent resource for both students and teachers," and that she "ran a tight program and was well organized." ECF No. 49-21. In short, there is a material dispute of fact as to this issue.

Third, Stewart argues that her firing was pretextual because she properly provided leadership in curriculum development and planning, and in the implementation of college policies and procedures. In instances where she did not actively implement a college policy, such as ensuring that students properly register and pay tuition, Stewart claims doing so was not an essential function of her job.

Stewart's job description states that providing leadership in curriculum development and planning, and in the implementation of college policies and procedures was one of her essential job functions. Unfortunately, the description does not offer any clarity as to what this obligation entails. MTECH asserts that the policies and procedures that Stewart was required to implement included attendance, payroll, enrollment, and tuition policies. But Stewart disagrees. Specifically, she argues that she had no supervisory responsibility over tuition collection and student registration. Some testimony from MTECH's leadership accords with this position. Both Vice President Peterson and President Christensen agree that MTECH's student services department was entirely responsible for ensuring that students properly registered and paid tuition. ECF No.

---

[15] Significant objective falsehood, from the perspective of management, is sufficient for a finding of pretext in the context of McDonnell Douglas. *Kendrick*, 220 F.3d at 1231.

40-7 at 54:20-25; ECF No. 40-4 at 26:12-27. But testimony from President Christensen indicates that Stewart had at least one responsibility related to tuition and registration: preventing students who had neither paid tuition nor registered from attending apprenticeship classes.

According to Christensen, it was Stewart's responsibility to ensure that when instructors took a roll call of their class, they checked to see if extra students were present and removed those extra students from the session. Whether or not Stewart held this responsibility matters because she fully admits that students who did not register sat in on apprenticeship classes and does not recall whether students attended classes without paying. ECF No. 40-2 at 252:21-253:10, 254:8-10. But Stewart claims that preventing non-registered students from attending classes was the student services department's job, not hers. *Id*. at 252:8-9. The same was true of students who did not pay tuition. As Stewart puts it, "[t]uition wasn't my thing either. They had to pay that through student services. What they were allowed to do was a student services problem. I had no idea who had paid and who hadn't paid." *Id*. at 253:18-21. Ultimately, whether preventing nonregistered and nonpaying students from attending classes is an essential duty of Stewart's position is a disputed issue of material fact. A jury could find that MTECH improperly held Stewart responsible for performing this work when she should not have been, providing an additional basis for a finding of pretext.

Stewart does not contest that one of her essential duties was to implement MTECH's payroll policy by verifying instructor timecards. MTECH argues that instructors let students out of class early and punched in as though they had performed their full teaching load. Stewart then rubber stamped their timecards though she knew they were lying. But Plaintiff disputes that she failed to perform this essential function of her job. As she testified:

> I had 35 teachers, 35 classes, five different campuses to cover. I couldn't be
> everywhere. I couldn't do everything. I mean, I'm only one person—one limited

person. You can see by the job description there is quite a list there. And then you multiply that by 35 students, 35 teachers, no I was not perfect, but I tried to make sure that the guys were as accurate as they could be.

*Id.* at 242:10-17. Like her essential role of tracking the teaching schedules of instructors, Stewart asserts that she was given a task that was impossible to complete. To meet MTECH's standards would have required her presence in each classroom. When push came to shove, she had to, at least partially, rely on her instructors to truthfully fill out their timecards. Once more, the court decides that a reasonable juror could find that MTECH's expectations were implausible, and thus, pretextual.

MTECH maintains that another one of Stewart's essential job functions, under her obligation to implement MTECH policies, was to submit attendance rolls to local agencies. Stewart disputes that this was her responsibility. First, she claims that submitting attendance rolls is not explicitly listed as an essential function in her job description. ECF No. 40-21. Second, in Stewart's performance reviews for 2017 and 2018, there is a box asking supervisors to indicate whether a faculty member's rolls were current. In both years, Reynold indicated that this requirement was "Not Applicable" to Stewart. ECF No. 40-18, 40-19. MTECH rebuts these facts by noting that while this function was not explicitly labeled an essential job function, Stewart's job description includes a provision under the "Directors Responsibilities" heading stating that she must "report student progress to local state agencies." ECF No. 40-21 at 3. According to MTECH, this responsibility must be treated as an essential job function because failing to report attendance information in a timely manner could place the apprenticeship program, and MTECH, in danger of losing its accreditation. ECF No. 40-4 at 22:9-16. Stewart disputes that the stakes of missing a deadline were quite so high, but under the standard described in *Kilcrease v. Domenico Transp. Co.*, MTECH deserves some deference as to whether this job function rises to the level of

"essential." *See* 828 F.3d 1214, 1221–22 (10th Cir. 2016) ("Because it is the employer's role to describe the job and functions required to perform that job, [courts should] not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity.").

Even if submitting attendance rolls to agencies was an essential aspect of her job, Stewart presents evidence that she should not have been held responsible for failing to submit attendance rolls. Stewart fully admits that when she was fired, many attendance roles had not been submitted. In fact, over 1,600 unsubmitted rolls were pending at the time of her termination. ECF No. 50-3. But she argues that submitting these rolls was an impossible task. According to both Stewart and Bueno, during the 2017 and 2018 school years, instructors could not reliably login to their classroom computers or the NorthStar System through which they input attendance at the start of each class.[16] ECF No. 50-2. Without the electronic rolls from teachers, Stewart was unable to submit attendance rolls to the entities that required them. On February 13, 2019, at the latest, Stewart notified Reynolds that she required nighttime IT support in order to address this problem and that she and her assistant were unable to collect rolls without technical assistance. *Id*. Stewart suggested hiring full-time and part-time assistants, increasing teacher responsibilities, and expanding nighttime NorthStar and IT support in order to improve roll submission; however, there is no indication that Reynolds ever made any attempt to provide Stewart with this help during the

---

[16] Testimony from Bueno, Stewart's assistant, also indicates that Stewart was hampered by the lack of NorthStar support and that she was put in a difficult position. ECF No. 50-3 ("The rolls that were submitted to me regularly were mostly from teachers who had issues getting into computers or on Northstar, which happened more frequently than we liked and we were never provided IT assistance for night classes. IT also asked us to not put in requests for the teachers but to have the teachers do it themselves. Even though no IT help was there at the time the teachers were.").

Case 2:20-cv-00086-JNP-DBP   Document 61   Filed 02/09/23   PageID.1824   Page 42 of 45

final days of her employment.[17] Indeed, Reynolds admits that he never considered implementing Stewart's suggested changes. ECF No. 40-8 at 98:14-23. Giving Stewart the benefit of the doubt, as required on a motion for summary judgment, the court determines that a reasonable juror could find that Stewart performed the requirements of this essential job function given the technological limitations.

Fourth, Stewart argues that MTECH's reasons for termination were pretextual because she properly assisted MTECH's Vice President for Instruction and the Director of Trades in carrying out accreditation activities and assignments for the COE. MTECH alleges that "[t]he narrative and exhibits for the COE reaffirmation visit were due in July and" that due to Stewart's failings, they "weren't completed until October 20th."[18] ECF No. 40-20. MTECH claims that, because of Plaintiff's delays, "[t]he help of other MTECH staff was necessary to get the information entered and edited before the visit on October 22nd." *Id.*

Stewart disputes that she was ultimately responsible for ensuring that MTECH met the COE deadline and that she failed to complete critical narratives and exhibits in a timely manner. ECF No. 49-12. Specifically, she claims that she completed almost all of the narratives and exhibits for the apprenticeship program and submitted these documents to MTECH's Coordinator for Trades, Ruby Pututau, ("Pututau") before the COE deadline. *Id.* Pututau was ultimately responsible for submitting narrative and exhibits. *Id.* Stewart admits that she held back "a few"

---

[17] Prior to Stewart's termination, MTECH's computer "help desk" stopped providing full support at 5:00 p.m., although it offered "on call services." However, there was separate support staff available for NorthStar that was not available while the apprenticeship classes were taught. See ECF No. 40-7 at 69:24-71:10. Moreover, MTECH had only one full-time employee working at the computer help desk, with three other technicians that were available to support that role when needed. ECF NO. 40-6 at 52:18-53:5.

[18] In his deposition, Reynolds states that these exhibits were due in August 2018. ECF No. 40-8 at 169:6-13.

documents because she required Pututau to answer questions before handing them over. *Id*. Pututau allegedly never responded to these questions, leaving Stewart unable to submit her remaining exhibits and narratives. *Id*. Taking these facts as true, a reasonable juror could find that Stewart met this essential function of her job and that this portion of MTECH's termination letter was pretextual.

Fifth, Stewart argues that MTECH's reasons for termination were pretextual because she properly assisted in interviewing, hiring, performance appraisals, and discipline of staff. In its termination letter, MTECH claimed that Stewart failed to meet this essential requirement of her position by hiring instructors so close to the start dates of semesters that they could not teach their orientation classes because they had not yet completed onboarding. ECF No. 40-2 at 256:4-16; ECF No. 40-8 at 141:16-23. As a result, substitute apprenticeship instructors had to teach these nights. *Id*. Stewart disputes that hiring instructors in time to teach the first class of each semester was an essential requirement of her job. First, she notes that she had no power to hire instructors, because hiring had to "go through HR processes." ECF No. 40-2 at 209:4-5. Additionally, she indicates that the human resources background check was often the limiting factor preventing instructors from teaching their first class, not her actions. *Id*. at 255:3-9. Moreover, Stewart argues that during her fifteen years at MTECH, apprenticeship instructors were always hired late and "at the end it was always a scramble." *Id*. at 256:24. Throughout this entire period, this process was "never a problem. The hiring process was the same from the time I started there, once we started having a lot of enrollment. Nothing changed." *Id*. at 257:4-7. The unchanging nature of the program could suggest that MTECH did not seriously consider hiring instructors for their orientation class an essential function of Stewart's job. The inconsistent expectations with which

this job requirement was allegedly enforced could allow a juror to find that MTECH's reasons for firing Stewart were pretextual.

Finally, it is important to note that MTECH's actions after firing Stewart may also indicate pretext. Stewart presents evidence that tends to show MTECH treated a similarly situated individual differently than Stewart. Stewart argues that one of the reasons she was not able to compile roll calls was that instructors could not login to their classroom computers or the NorthStar System through which they input attendance. ECF No. 50-2. On February 13, 2019, Stewart notified Reynolds that she required nighttime IT support in order to address this problem. Soon after this request, Reynolds terminated Stewart without providing any assistance. He was then temporarily installed as Director of Apprenticeships. During Reynolds' tenure as acting Director, the roll call issue did not improve. Indeed, many of the problems that dogged the program continued, including instructors dismissing students early. ECF No. 40-8 at 151:17-24. When MTECH hired Carron-Campbell as Stewart's permanent replacement, the apprenticeship program engaged in sweeping structural changes, including the hiring of new IT/Northstar support staff to ensure that instructors could teach their classes and take student roll in the evenings without issue. ECF No. 40-6 at 59:8-23, 64:9-12. While it is true that this hiring corresponded with growth in the program, this was the very assistance that Stewart had requested in the days leading up to her firing. In short, Carron-Campbell was given the same tasks as Stewart, but was provided significantly more support.

Treating one employee differently than a similarly situated individual is a classic indicator of pretext. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997). To determine whether a firing was pretextual using this method, courts must take care to ensure that the two compared employees are actually similarly situated. The two comparators must be individuals "who deal

44

with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Id*. "The court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *Id*. Here, it is undisputed that Carron-Campbell was similarly situated. She had the same title as Stewart and, as far as this court can determine, the same responsibilities and supervisor. Ultimately, the court holds that the disparate treatment of Plaintiff vis-à-vis her replacement introduces doubt as to MTECH's true motivations for firing Stewart.[19]

Standing alone, each of the many minor alleged inconsistencies and potential falsities in Defendant's termination letter likely would not be sufficient Stewart to meet her burden in opposing summary judgment. But the collective weight of Plaintiff's evidence suggests a scenario that is "fishy and suspicious" enough that a jury could potentially find Defendant's stated reasons for Stewart's termination to be pretextual. *Jaramillo*, 427 F.3d at 1310. The court is, therefore, narrowly compelled to deny summary judgment on Plaintiff's wrongful termination claims.

## CONCLUSION

For the forgoing reasons, the court DENIES MTECH's motion for summary judgment.

DATED February 8, 2023

BY THE COURT

Jill N. Parrish
United States District Court Judge

---

[19] A plaintiff may rely on evidence of disparate treatment in order to show pretext. *See Udo v. Tomes*, 54 F.3d 9, 13 (1st Cir.1995). For instance, the First Circuit held that the similarly situated individual test can prove pretext in *Molloy v. Blanchard*. 115 F.3d 86, 92 (1st Cir. 1997).